## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MELANIE E. DAMIAN, as receiver of
TODAY'S GROWTH CONSULTANT,
INC. (d/b/a THE INCOME STORE),

      Plaintiff,

v.                                 Case No. 8:21-cv-1999-WFJ-MRM

BUCKS OF AMERICA, LLC (d/b/a
BUCKS OF NEBRASKA) and CODY
NEER,

      Defendants.

_____/

## __BENCH TRIAL ORDER__

Ms. Damian, a court-appointed receiver for Today's Growth Consultant, Inc. ("TGC"), brings this action to recover approximately $2,400,000 transferred by TGC to Defendant Cody Neer through his web development company, Bucks of America, LLC ("Bucks"). Dkt. 28 at 19. Ms. Damian asserts three claims: Count I—actual fraudulent transfers under the Illinois Uniform Fraudulent Transfer Act (the "IUFTA"), 740 ILCS § 160/1 *et seq.*; Count II—constructive fraudulent transfers under the IUFTA; and Count III—unjust enrichment. *Id.* at 13–19.

During a one-day bench trial, the Court heard the testimony of Ms. Damian, Mr. Neer, Emily Merrill (a former accounting manager at TGC), David Kelley (a former CEO of TGC), and Peter Kent (Mr. Neer's expert on the issue of web-

development and marketing). *See* Dkt. S-85. Upon careful consideration of all the testimony and evidence presented in this case, the Court finds that Defendants have carried their burden of establishing that they provided reasonably equivalent value for the majority of TGC's transfers and that they accepted all of TGC's transfers in good faith. The Court consequently voids TGC's transfers only to the limited extent discussed below.

## FINDINGS OF FACT[1]

The parties agree that, between at least January 2017 and October 2019, TGC operated as a stereotypical Ponzi scheme. Dkt. S-85 at 17; *see also* SEC Dkt. 1. Throughout this time, TGC and Kenneth Courtright (TGC's founder) allegedly raised more than $75,000,000 from over 500 investors who entered into "Consulting Performance Agreements" under which investors would provide up-front payments in exchange for a minimum guaranteed return on revenues generated by TGC-operated websites. Dkt. 28 at 7–8; SEC Dkt. 1 at 1–4. In reality, TGC was primarily covering its financial obligations to prior investors with the payments of new investors. *Id.* It appears that TGC's business model was never sustainable.

In 2018, Mr. Neer was introduced to Mr. Courtright by a mutual acquaintance for whom Mr. Neer had previously provided ecommerce services. Dkt. S-85 at 136.

---

[1] The instant receivership action is ancillary to *SEC v. Todays Growth Inc. et al.*, Case No. 19-cv-8454, currently pending in the United States District Court for the Northern District of Illinois (the "SEC Action"). The Court will cite to the SEC Action as follows: "SEC Dkt. [Docket Number]."

Mr. Courtright explained that TGC was in the business of purchasing websites, domains, and other online assets. *Id.* He also expressed his interest in buying ecommerce websites created and operated by Mr. Neer. *Id.* Eventually, Mr. Neer visited TGC's offices in Lancaster, Pennsylvania to further discuss a possible business relationship. *Id.* at 137. TGC appeared to be a legitimate and reasonably successful business at this time. *Id.*

Between August and September of 2018, Mr. Neer and TGC executed their first set of transactions (the "First Transaction Bucket"). Dkt. S-85 at 137–38; Dkt. 84-9 at 10; Dkt. 83-10; Dkt 83-11 at 29. The First Transaction Bucket comprised an exchange of $861,000 for ten websites that were already created and operated by Mr. Neer through Bucks. Dkt. 84-9 at 10–11; Dkt. 83-10 at 1–55. Of these websites, DonaldTrumpCollectables.store ("DTC") was by far the most expensive at $600,000. Dkt. 83-10 at 45–55. This is largely explained by the fact that DTC had received thousands of orders, was operating at a profit, and came with a buyer's email list of over 75,000 individuals at the time of its sale. Dkt. 83-9 at 1–5. The other websites included in the First Transaction Bucket, while less profitable, were functioning ecommerce stores of an apparently sophisticated nature. Dkt. 84-9 at 11. They sold for between $64,500 and $12,000 apiece. Dkt. 83-10 at 1–55.

Shortly thereafter, Mr. Neer and TGC engaged in a second set of transactions totaling $155,017.93 (the "Second Transaction Bucket"). Dkt. S-85 at 145; Dkt. 84-

8 at 25. The Second Transaction Bucket primarily consisted of a broker-type deal in which TGC transferred $149,500 to Bucks' bank account on September 19, 2018, Mr. Neer transferred the same to a third party ecommerce website owner on September 21, 2019, and the third party transferred four ecommerce websites to TGC sometime later. Dkt. S-85 at 145–46; Dkt. 84-8 at 25; Dkt. 84-9 at 12. Very little was established at trial concerning these four websites. Mr. Neer testified that the remaining $5,517.93 of the Second Transaction Bucket represents reimbursement payments to Mr. Neer for his team's airfare, hotels, and food during their trip to TGC's offices in Pennsylvania. Dkt. S-85 at 146–47; Dkt. 84-9 at 12.

On November 2, 2018, Mr. Neer and TGC entered into a Multi-Site Purchase Contract (the "Agreement"), which was later orally renewed (the "Renewed Agreement") (collectively, the "Third Transaction Bucket"). Dkt. 83-2 at 1; Dkt. S-85 at 154. The Agreement provided that, in exchange for $1,000,000 and 15% of gross revenues, Mr. Neer would assemble a team of fifteen or more professionals and create 100 ecommerce websites from scratch. Dkt. 83-2 at 1. The Agreement also provided revenue goals for the anticipated websites. At trial, the evidence and testimony tended to show that $10,000 was on the low to average end of pricing for an ecommerce website developed by a Shopify Partner such as Mr. Neer. Dkt. 84-9 at 16; Dkt. S-85 at 148–151; Dkt. 84-7 at 1.

Pursuant to the Agreement and the Renewed Agreement, Mr. Neer ultimately delivered 178 ecommerce websites to TGC for $1,439,500. Dkt. S-85 at 92, 153, 167; Dkt. 84-9 at 12. In addition to creating these websites, Mr. Neer provided hands-on ecommerce training to TGC employees, gave TGC employees access to a $1000 eCommerce Brand Academy course list, engineered Facebook advertisement accounts to support his newly constructed websites, leveraged his existing relationships with merchandise suppliers to TGC's benefit, and helped managed over 400 ecommerce websites in TGC's portfolio (including the ones he had created). Dkt. S-85 at 153–178. Mr. Neer also paid at least $798,098.44 to independent contractors. *See* Dkt. 84-4; Dkt. 84-9 at 18.

TGC's final payment to Mr. Neer from the Third Transaction Bucket occurred on September 28, 2019. Dkt. S-85 at 175. Approximately three months later, Mr. Neer learned that TGC had been shut down due to a United States Securities and Exchange Commission ("SEC") investigation. *Id.* Mr. Neer never heard from Mr. Courtright again. His work for TGC essentially ended at this point.

On December 12, 2019, the United States District Court for the Northern District of Illinois appointed Ms. Damian to serve as TGC's receiver. SEC Dkt. 19. She took custody of TGC's operations, shut down TGC's existing ecommerce websites, and began investigating TGC's records immediately thereafter. Dkt S-85

at 11. Before long, Ms. Damian and her forensic accountants identified TGC's payments to Mr. Neer. *Id.* at 14; Dkt. 83-11 at 29.

The records established that TGC paid Mr. Neer $2,451,594.44. Dkt. 83-11 at 29. Analysis further demonstrated that, of the 178 websites delivered through the Third Bucket of Transactions, all but four were operating at a loss prior to being shut down. Dkt. 83-5. TGC's entire website portfolio (a combination of 2990 ecommerce and authority websites) was eventually valued at $1,600,000. Dkt. S-85 at 33.[2] To this date, TGC has been unable to recoup anywhere near the full value it paid to obtain and operate Mr. Neer's websites. Dkt. 83-30 at 1; Dkt. S-85 at 34.

## LEGAL STANDARDS

### I.    Fraudulent Transfers

In relation to actual fraudulent transfers**,** the IUFTA provides that:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

740 ILCS § 160/5(a)(1). "[A]ctual intent to hinder, delay, or defraud creditors" is presumed under the so-called "Ponzi scheme presumption" where, as here, the parties stipulate that the debtor operated as a Ponzi scheme. *In re Equip. Acquisition*

---

[2] An individual valuation for each of the websites created by Mr. Neer was never performed. Dkt. S-85 at 33.

*Res., Inc.*, 483 B.R. 823, 834 (Bankr. N.D. Ill. 2012); *see also In re Lancelot Invs. Fund, LP*, 451 B.R. 833, 839 (Bankr. N.D. Ill. 2011). Still, "[a] transfer is not voidable . . . against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." § 160/9(a). A transferee may therefore defeat a fraudulent transfer claim under the IUFTA—even where the Ponzi scheme presumption applies—by establishing an affirmative defense of taking the subject transfer(s) in good faith for reasonably equivalent value. *See In re Lancelot*, 451 B.R. at 841 (recognizing § 160/9(a) as an "exception to the voiding of fraudulent transfers" in the Ponzi scheme context).

In relation to constructive fraudulent transfers, the IUFTA provides that:

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or . . . intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

§ 160/5(a)(2)(A)–(B). "The law presumes that debtors who engage in Ponzi schemes are insolvent because by definition a Ponzi scheme inevitably becomes insolvent at some point." *In re Lancelot.*, 451 B.R. at 839 (citation omitted). Accordingly, in the context of a transfer made by a debtor operating a Ponzi scheme, the central

constructive fraudulent transfer issue is whether the transferee provided reasonably equivalent value.

Reasonably equivalent value, whether analyzed in the actual or constructive fraudulent transfer context, is a question of fact. *See In re First Com. Mgmt. Grp., Inc.*, 279 B.R. 230, 235 (Bankr. N.D. Ill. 2002) (citing *In re Image Worldwide, Ltd.*, 139 F.3d 574, 576 (7th Cir.1998)). While there is no "fixed mathematical formula" for determining it, important factors to consider include "fair market value" and whether "the [transaction] was an arm's length transaction between a willing buyer and a willing seller." *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997) (citations and internal quotations omitted). "[T]he debtor need not collect a dollar-for-dollar equivalent[,]" *id.* (citations and internal quotations omitted), but "the debtor should receive . . . 'an amount not disproportionately small as compared with the value of the property of obligation' the debtor has given up." *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000), *aff'd sub nom*, *Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001). "In determining whether reasonably equivalent value was received under the [I]UFTA, courts should consider how that phrase has been construed under the Bankruptcy Code." *In re Knippen*, 355 B.R. 710, 734 (Bankr. N.D. Ill. 2006), *aff'd sub nom. Knippen v. Grochocinski*, No. CIV.A. 07 C 1697, 2007 WL 1498906 (N.D. Ill. May 18, 2007) (citations omitted).

## II.      Unjust Enrichment

Under Illinois law, "[u]unjust enrichment is a 'quasi-contract' theory that permits courts to imply the existence of a contract where none exists in order to prevent unjust results." *In re Lancelot*, 451 B.R. at 842 (citation omitted). A plaintiff seeking to establish an unjust enrichment claim must show that: "(1) the defendant has unjustly retained a benefit to the plaintiff's detriment, and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 634–35 (N.D. Ill. 2016).[3] "When two parties' relationship is governed by contract," however, "they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004) (citations omitted).

## CONCLUSIONS OF LAW

Given the applicability of the Ponzi scheme presumption, the outcome of the instant case primarily turns on two issues: (1) whether Mr. Neer accepted TGC's transfers in good faith; and (2) whether Mr. Neer provided reasonably equivalent value. If both predicates are established, no transfer is voidable, and it would not be

---

[3] Illinois law is largely similar to Florida law in these respects. *See State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013) (explaining that unjust enrichment claims are brought "to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity").

inequitable for Mr. Neer to retain the benefits of TGC's transfers. If good faith is established but not reasonably equivalent value, a fraudulent transfer occurred that must be equitably voided. If neither good faith nor reasonably equivalent value is established, a fraudulent transfer occurred that must be wholly voided. The Court will address each issue in turn.[4]

## I.      Good Faith

In order to carry his burden of establishing good faith, Mr. Neer must show by a preponderance of the evidence that: (1) the subject transactions were arm's length transactions; (2) he had "an honest belief in the propriety of the activities in question;" (3) he had "no intent to take unconscionable advantage of others;" and (4) he had "no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *In re Lancelot*, 451 B.R. at 841 (citation omitted).

The Court finds that Mr. Neer has carried this burden. As an initial matter, there is no evidence in the record that suggests the existence of a personal or professional relationship between Mr. Neer and Mr. Courtright prior to the execution of the First Transaction Bucket. Mr. Neer credibly testified that he had been

---

[4] Mr. Neer was the contracting party for all contracts, oral and written, implicated in the instant case. *See* Dkt. 83-10; Dkt. 83-2. Mr. Neer utilized Bucks for receiving funds from TGC for services that Mr. Neer provided to TGC. Dkt. 52 at 2. The parties therefore do not dispute that Mr. Neer would be liable for any voidable transfer from TGC to Bucks for services provided by Mr. Neer as the contracting party. Beyond that, section 160/9(b) of the IUFTA provides that "to the extent a transfer is voidable . . . [t]he judgment may be entered against . . . the first transferee of the asset or the person for whose benefit the transfer was made." Accordingly, there is no functional difference between Mr. Neer and Bucks for purposes of liability.

introduced to Mr. Courtright by a mutual friend named Chris Gorka only after Mr. Neer provided his expertise to Mr. Gorka following an ecommerce seminar. Dkt. S-85 at 135–36. Given this, Mr. Neer could have sold the ten ecommerce websites included in the First Transaction Bucket to anyone who was interested in building an ecommerce portfolio. That someone just happened to be TGC. Of course, the Court recognizes that a professional relationship of sorts developed after the First Transaction Bucket. But it was not enough to create a fiduciary relationship or any other kind of special, non-arms-length relationship between Mr. Neer and Mr. Courtright. Indeed, Mr. Neer never became a TGC employee or otherwise aligned his self-interests with those of Mr. Courtright. Mr. Neer negotiated and worked for his own benefit—it is abundantly clear that Mr. Courtright did the same.

Mr. Neer also had an honest belief in the propriety of his business activities with TGC. Prior to meeting Mr. Courtright, Mr. Neer was an accomplished ecommerce expert who had secured a Shopify partnership and worked with companies like Target in the ecommerce realm. Dkt. S-85 at 129–35, 148. Upon visiting Mr. Courtright at TGC's headquarters, Mr. Neer was shown offices filled with over a hundred employees and all the trappings of legitimacy. *Id.* at 137. It follows that there was no reason for Mr. Neer to even consider that his business activities might end up helping Mr. Courtright perpetuate fraud on TGC's investors. The opportunity to work with an apparently successful ecommerce entity like TGC

was merely a natural step in Mr. Neer's otherwise impressive career. And it is more than likely than not that Mr. Neer simply understood his activities with TGC to be a continuation of the legitimate business he had been doing for years. Finally, the Court notes that hindsight awareness of Mr. Courtright's Ponzi scheme does not diminish the import of these facts when assessing Mr. Neer's subjective viewpoint. If Mr. Courtright was good at anything, it was draping a veil of propriety over the scheme he used to defraud his investors.

This brings the Court to whether Mr. Neer had an intent to take unconscionable advantage of TGC or defraud others, as well as whether Mr. Neer had knowledge that his activities might do the same. On these points, Ms. Damian primarily relies on (1) a chain of emails in which Mr. Neer allegedly mislead Mr. Courtright as to the value of DTC and (2) her own conclusory allegations that Mr. Neer was aware that "TGC lacked the resources to be able to build and manage the high volume of websites" called for in the Agreement. Dkt. 51 at 10–11. Ms. Damian maintains that these pieces of evidence outweigh all of the other evidence in the record that tends to show Mr. Neer's good faith.

The Court is not persuaded. Contrary to Ms. Damian's assertions, Mr. Neer did not mislead Mr. Courtright in his email correspondences about DTC. The numbers Mr. Neer alluded to concerning DTC's sales were largely corroborated by attached charts whose accuracy has never been called into question. Ms. Damian

essentially argues that these numbers were misleading because they went down once DTC was handed over to TGC in the First Transaction Bucket. This, however, has no bearing on the accuracy of said numbers at the time they were communicated to Mr. Courtright. As to Mr. Neer's statement that "I am confident that sales volume will continue to grow towards the 2020 election," Dkt. 83-9 at 1, the Court notes that functional puffery cannot form the basis of a fraud claim predicated on misrepresentation, *see Stuve v. Kraft Heinz Co.*, No. 21-CV-1845, 2023 WL 184235, at *11 (N.D. Ill. Jan. 12, 2023). Mr. Courtright was a sophisticated buyer capable of assessing the information he was given. There is no indication that he relied on Mr. Neer's non-quantifiable projection of future optimism—or that he cared in light of his Ponzi scheme. Lastly, Mr. Neer's discussion about "Donald Trump Coin" sales does not change the Court's analysis. Mr. Neer never said that he sold $6,000,000 worth of Donald Trump Coin on DTC, as Ms. Damian suggests. He stated this figure in the abstract directly after claiming that "I am also very familiar with this industry and space[.]" Dkt. 83-9 at 1. It was therefore clear that Mr. Neer was further exemplifying his experience in the general marketplace for Donald Trump collectibles. In sum, these communications evince an arm's length sales pitch between Mr. Neer and Mr. Courtright, not bad faith.

The notion that Mr. Neer was acting in bad faith because he was allegedly aware that TGC lacked necessary resources to manage numerous ecommerce

websites is also refuted by the record. To begin with, Mr. Neer was initially operating under the impression that TGC had hundreds of trained domestic employees as well as foreign support staff in Ukraine. Dkt. S-85 at 155. This inherently supports Mr. Neer's position that he had an honest belief that TGC possessed adequate manpower to manage the product TGC tasked him with producing. More importantly, though, once it became clear to Mr. Neer that TGC's employees were not properly trained in ecommerce management, he did everything in his power to train them. Mr. Neer provided free hands on training, free access to expensive training materials, free on-call assistance to TGC staff, and free consulting to TGC executives under Mr. Courtright. Dkt. S-85 at 169–70. This is not to mention the ecommerce management that Mr. Neer performed himself.

Simply put, these are not the actions of one who is acting in bad faith. Ms. Damian cannot plausibly claim otherwise without evidentiary support, which she has failed to produce. A preponderance of the evidence demonstrates that Mr. Neer accepted TGC's payments with the sincere belief that TGC could make this venture work. His subsequent actions establish an intent to go above and beyond his contractual obligations to achieve success for everyone involved. In view of this, the Court finds that Mr. Neer acted in good faith throughout his relationship with TGC.[5]

---

[5] Ms. Damian's claim that Mr. Neer acted with an intent to defraud investors is also undercut by the fact that Mr. Neer unknowingly interfered in Ms. Damian's receivership activities by attempting to help TGC investors gain access to certain websites after TGC's operations had been

## II.    Reasonably Equivalent Value

As noted above, reasonably equivalent value is an issue of fact. It is "appropriate to analyze whether reasonably equivalent value exists by focusing on the consideration exchanged between the debtor and the defendant, rather than focusing on the conduct of debtor's management[.]" *In re First Com. Mgmt. Grp., Inc.*, 279 B.R. 230 at 239. Ultimately, Mr. Neer bears the burden of establishing reasonably equivalent value by a preponderance of the evidence.[6]

Before moving to analyze each of the transaction buckets individually, however, it is important to reiterate a handful of facts relevant to all the subject transactions. First, it is undisputed that Mr. Neer was a highly qualified ecommerce professional at the time he began working with TGC. He had experience working for Thompson Reuters and Target as well as consulting for notable figures such as Kevin Harrington. Dkt. S-85 at 129–30; Dkt. 84-9 at 8–9. Mr. Neer had also created and managed successful ecommerce websites and hosted yearly workshops for eCommerce Brand Academy. Dkt. S-85 at 134. Second, Ms. Damian has failed to put forth any evidence rebutting Mr. Neer's position that the fair market value for

---

shut down. Dkt. S-85 at 173, 187. Once again, these are not the actions of one who was intentionally or knowingly defrauding another.

[6] Normally, the burden of proving a lack of reasonably equivalent value rests on the party asserting the existence of a fraudulent conveyance. *See Barber*, 129 F.3d at 387. Mr. Neer nevertheless bears the burden here due to the fact that section 160/9(a) calls for a showing of good faith *and* reasonably equivalent value in order to defeat a fraudulent transfer claim under section 160/5(a) where the Ponzi scheme presumption applies.

an ecommerce website developed by someone of Mr. Neer's skills ranged from $5,000 to over $100,000 at the time of the subject transactions. Dkt. S-85 at 151; Dkt. 84-9 at 16; Dkt. 84-7 at 1. Both Mr. Neer and his expert Mr. Kent credibly testified to this fact with the support of quotes obtained through market research. *Id.* The evidence also tends to show that a previously developed ecommerce website that had been properly managed and advertised would be even more expensive. Dkt. S-85 at 96; Dkt. 84-7 at 1. Finally, Mr. Neer effectively built or provided each of the ecommerce websites in question. Ms. Damian does not claim otherwise.

### a.  The First Transaction Bucket.

The First Transaction Bucket breaks down into the following ten transactions: (1) $600,000 for DTC; (2) $64,500 for TinyHouseSupplyShop.com; (3) $50,000 for BucksOf.com; (4) $30,000 for GrandeurSkincare.com; (5) $30,000 for PerfectPetBoutique.com; (6) $22,500 for AmericanGreatness2020.com; (7) $20,000 for BattleRoyaleCommunity.com; (8) $20,000 for ShopMyAmerica.com; (9) $12,000 for TrampolineAir.com; and (10) $12,000 for LaportaSports.com. Dkt. 83-10 at 1–55; Dkt. 84-9 at 10–11.

The Court finds that Mr. Neer has carried his burden of establishing that DTC was reasonably equivalent in value to $600,000. At the time of the transfer, DTC was a consistently profitable ecommerce store averaging well over $10,000 in sales a month at a profit margin of roughly 50%. Dkt. 83-9 at 1. It also came with a list of

75,000 buyer's emails as well as established inventory, warehousing, and shipping processes. Dkt. 83-9 at 1; Dkt. 84-9 at 11. This means that DTC was a functioning business with significant future earning potential when TGC bought it. What is more, following the transfer, Ms. Damian's own accounting shows that DTC made $57,099.58 in net profit its first three months (October through December of 2018). Dkt. 83-6 at 64. DTC made another $107,953 in net profit in 2019. Dkt. 83-7 at 188. Accordingly, assuming proper management, DTC would have paid for itself within five to seven years of its purchase, leaving TGC with a significant source of future income. While the Court recognizes that valuing established ecommerce website purchases is not an exact science, the aforementioned numbers greatly diminish the difficulty in valuing DTC; indeed, it was most likely worth more than $600,000.[7]

Ms. Damian's alleged difficulties in selling DTC after she shut it down during her receivership does not diminish its value at the time of the transfer. To begin with, the Court is aware of no authority indicating that reasonably equivalent value should be evaluated based on future sales value or salability. The only authority which might suggest the propriety of such a method is that which instructs courts to consider "whether the recovery the debtor's creditors could legitimately expect to

_____

[7] Mr. Neer claims that the transfer of DTC was in exchange for $600,000 *and* 15% of gross revenues. The Court cannot locate a contractual clause providing for 15% gross revenues in the subject contract for DTC's transfer. *See* Dkt. 83-10 at 45–55. Notwithstanding, because the parties agree that Mr. Neer was never paid 15% of gross revenues, the issue is not relevant for considering reasonably equivalent value.

realize from the asset received by the debtor is reasonably equivalent to the value of the asset transferred by the debtor." *In re Com. Fin. Servs., Inc.*, 350 B.R. 559, 577 (Bankr. N.D. Okla. 2005) (citations omitted). But even the cases that take this line recognize that reasonably equivalent value is "[t]he objective market value [of the debtor's acquired asset] *at the time of transfer*, looked at from the creditor perspective[.]" *In re First Cap. Holdings Corp.*, 179 B.R. 902, 907 (Bankr. C.D. Cal. 1995) (emphasis added) (citations omitted). As explained above, the objective market value at the time of the transfer was reasonably equivalent to $600,000. Additionally, unrebutted testimony in the record tended to show that shutting down an active ecommerce store significantly diminishes its value, perhaps even to zero. Dkt. S-85 at 172. It would thus make little sense to base reasonably equivalent value on the sales value Ms. Damian could or could not secure after shutting DTC down during her receivership. DTC was worth around $600,000 when it was transferred. It was profitable after it was transferred. TGC and Ms. Damian's inability to retain that demonstrated value after it was shut down is irrelevant. *See In re First Com. Mgmt. Grp., Inc.*, 279 B.R. 230 at 239.

Moving forward, the Court finds that Mr. Neer has also demonstrated reasonably equivalent value as to TrampolineAir.com and LaportaSports.com—the websites that sold for $12,000 apiece. As previously noted, the fair market value of an ecommerce website properly constructed by a professional of Mr. Neer's abilities

and background ranged from approximately $5,000 to $100,000 depending on various factors. The value would naturally be higher for an established ecommerce website that had been professionally managed and advertised. *See* Skt. 84-7 at 1; Dkt. 84-9 at 16–17. Here, there is no dispute that both TrampolineAir.com and LaportaSports.com were developed and managed by Mr. Neer before being transferred to TGC. Mr. Kent's research further demonstrated that both were attractive and sophisticated ecommerce websites before being shut down. Dkt. 84-9 at 11–12. It follows that $12,000 is reasonably equivalent in value for each, especially in light of the fact that many ecommerce services providers were charging $10,000 for a freshly built ecommerce website at the time of the subject transfers. *See* Dkt. 84-7 at 1; 84-9 at 16–17.

Concerning the remaining websites included in the First Transaction Bucket, the Court finds that Mr. Neer has not met his burden of establishing reasonably equivalent value. Unlike TrampolineAir.com and LaportaSports.com, which were essentially sold for the market price of a newly constructed ecommerce website, the remaining websites were sold for between $64,000 and $20,000. Mr. Neer has presented little to no evidence explaining this gap in pricing. Indeed, beyond demonstrating the websites' attractive features through historic snapshots, Mr. Neer has provided nothing. The Court has no indication of their profitability, marketing history, traffic, or any other metric that could aid in making a proper valuation. This

being the case, Mr. Neer has failed to show how these websites were worth more than the $10,000 to $15,000 in fair market value he might have received for their creation and initial management. These websites' lack of profitability only reinforces the Court's conclusion.

### b.  The Second Transaction Bucket

The Second Transaction Bucket is comprised of two parts: (1) a $149,500 pass-through payment for four websites; and (2) a $5,517.93 reimbursement payment for travel expenses. The Court will address each separately.

Thus far, the instant case has exclusively revolved around the issues of good faith and reasonably equivalent value. The Second Transaction Bucket nevertheless requires consideration of a different question; namely, who qualifies as a "first" or "initial" transferee for purposes of the IUFTA? Although the answer is usually straightforward, it is not clear in the context of a true pass-through payment whether the intermediary qualifies as "the first transferee of the asset or the person for whose benefit the transfer was made." § 160/9(b)(1).

In *Bonded Financial Services, Inc. v. European American Bank*, the Seventh Circuit addressed an analogous issue in the bankruptcy context. 838 F.2d 890 (7th Cir. 1988). There, Michael Ryan controlled a currency exchange called Bond Financial Services, Inc. *Id.* at 891. After Ryan borrowed $655,000 from European American Bank, Bonded put $200,000 at Ryan's disposal by sending the Bank a

check directing that the funds be deposited into Ryan's account. *Id.* Ryan then instructed the bank to debit the account $200,000 in order to reduce his outstanding balance on the $655,000 loan. *Id.* It was subsequently determined that the $200,000 Bonded transfer was a fraudulent conveyance and the trustee for Bonded later sought to recover from the Bank as the initial transferee. *Id.* The Seventh Circuit ultimately concluded that, because "the Bank acted as a financial intermediary" and "received no benefit[,]" "the Bank was not the 'initial transferee' of Bonded's check even though it was the payee." *Id.* at 893. The court further explained that "'[t]ransferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent'." *Id.* at 894. Otherwise, "absurd results" follow. *Id.*

The Court finds the *Bonded* court's reasoning applicable to the subject $149,000 pass-through payment.[8] Mr. Neer credibly testified that TGC sent Bucks an unsolicited $149,000 and instructed Mr. Neer to send the same to a third-party in exchange for four websites. Dkt. S-85 at 145–46. This testimony was never meaningfully challenged by Ms. Damian. Mr. Neer, moreover, provided bank records that show $149,500 coming into Bucks' account on September 19, 2018, and the same going out of Bucks' account two days later. Dkt. 84-8 at 25. Hence, just like the Bank in *Bonded*, Mr. Neer never exercised true "dominion over the money"

---

[8] Courts considering fraudulent conveyance issues under uniform fraudulent transfer statutes, such as the IUFTA, often look to bankruptcy decisions for guidance. *See In re Image Worldwide*, 139 F.3d at 577 (explaining that the IUTFA is partly derived from 11 U.S.C. § 548).

or had "the right to put the money to [his] own uses." *See* 838 F.2d at 893. Mr. Neer simply "held [the money] only for the purpose of fulfilling an instruction to make the funds available to someone else." *Id.*  No benefits flowed to him. For these reasons, the Court holds that Mr. Neer was not legally the first transferee of the subject $149,000 pass-through payment or the person for whose benefit the transfer was made. *See In re Opus E., LLC*, 528 B.R. 30, 97 n.29 (Bankr. D. Del. 2015), *aff'd sub nom. In re: Opus E., LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom. In re Opus E. LLC*, 698 F. App'x 711 (3d Cir. 2017) (collecting caselaw on the issue of liability for pass-through payments). Judgment may not be entered against Defendants as to this transfer. *See* § 160/9(b)(1).

The $5,517.93 reimbursement requires a different analysis. Indeed, because there is no indication that courts are hesitant to treat reimbursement recipients as initial transferees under the IUFTA, *see In re Apex Auto. Warehouse, L.P.*, 238 B.R. 758, 773 (Bankr. N.D. Ill. 1999), a determination of reasonably equivalent value is appropriate as to this transfer. On this issue, Mr. Neer testified that the subject reimbursement payment represents payments to Mr. Neer for his team's airfare, hotels, and food during their trip to TGC's offices in Pennsylvania. Dkt. S-85 at 146–47; Dkt. 84-9 at 12. Mr. Neer further testified that the purpose of his travel was to verify TGC's legitimacy in order to further facilitate a deal or deals with Mr. Courtright. Dkt. S-85 at 147. The Court finds $5,517.93 a reasonable figure to pay

for Mr. Neer and his team's travel expenses. Significant business dealings often require in-person meetings. Without this one, TGC would not have been capable of obtaining Mr. Neer's assistance in jump-starting its ecommerce business plan.

### c. The Third Transaction Bucket

The Third Transaction Bucket comprises $1,439,500 in payments made to Mr. Neer through Bucks for 178 ecommerce websites and Mr. Neer's management services. All of these payments were made pursuant to the Agreement and the Renewed Agreement. As a result, the Court will address them collectively.

The Court begins with the websites themselves.[9] Ms. Damian's 2019 profit and loss documentation contains figures for 173 of the 178 websites included in the Third Transaction Bucket. Dkt. 83-7 at 1–188. Even assuming that this disparity is due to 5 of the 178 websites not existing or being ready to launch at the time Ms. Damian's receivership began, TGC paid Mr. Neer only about $8,320 per functioning site. As discussed extensively above, the unrebutted evidence and testimony presented at trial demonstrated that a person of Mr. Neer's skills and background could command $10,000 per ecommerce site constructed. Mr. Neer did, however, testify that a discount would be typical in the context of a high volume contract such as the Agreement and the Renewed Agreement. Dkt. S-85 at 151. Accordingly, if anything, $8,320 per site constitutes a reasonable discount somewhere near fair

---

[9] A complete list of the Third Bucket Transaction websites can be found at Dkt. 83-3 at 1–5.

market value. The fact that this figure actually represents TGC's underpayment on the Renewed agreement is immaterial.

On top of providing at least 173 ecommerce websites to TGC at fair market value, Mr. Neer also provided a number of services. These included hands-on ecommerce training for TGC employees, TGC employee access to a $1000 eCommerce Brand Academy course list, Facebook advertisement management, the advantage of Mr. Neer's existing relationships with merchandise suppliers, and some level of management for TGC's entire ecommerce portfolio. Dkt. S-85 at 153–178. Although it is difficult to put a value figure on these services and benefits in the context of a Ponzi scheme, they were undoubtedly palpable benefits conferred in good faith that raised TGC's ability to manage its ecommerce business and generate income therefrom.

Given this combination of goods and services, the Court finds that Mr. Neer provided reasonably equivalent value for TGC's $1,439,500 despite the fact that his websites were ultimately unprofitable. It is important to recognize, as Mr. Kent explained, that it takes time and investment for an ecommerce website to become successful. *See* Dkt. S-85 at 124. Many of the Third Transaction Bucket websites were live for six months or less before being shut down. *See* Dkt. 83-7 at 1–188. Others were live but wholly unadvertised. *Id.* And still others had yet to receive their product sourcing. *Id.* The unprofitability of these websites is therefore unsurprising

24

and sheds little light on their quality or future earning potential. What is more, an analysis of the financial figures for longer running websites demonstrates that initial advertising costs were a major contributor of negative returns. 101electronics.com, for instance, turned a $1,000 net profit in its final month after months of losses owing primarily to advertising costs. *Id.* at 3. BoatsofAmerica.com made $3,345 in net profit in its final month with no advertising costs. *Id.* at 37. The same trend can also be seen in the numbers for alpinemen.com, bashfulbaker.com, and decorposh.com. *Id.* at 9, 20, 54. It is worth reiterating here that it "appropriate to analyze whether reasonably equivalent value exists by focusing on the consideration exchanged between the debtor and the defendant, rather than focusing on the conduct of debtor's management[.]" *In re First Com. Mgmt. Grp., Inc.*, 279 B.R. 230 at 239. In the instant case, the Court has little doubt that Mr. Neer provided adequate consideration for the compensation he received. TGC's inability to manage the product Mr. Neer provided and Ms. Damian's questionable choice to shut down websites that might have operated at a profit without continued advertising expenses do not change this fact.[10]

---

[10] The Court also finds unpersuasive Ms. Damian's evidence that the receiver's attempt to sell the websites bore little success. Websites of this type require constant nurturing, advertising, and development because they exist in a highly dynamic market where search algorithms are in constant flux. Any site that is shutdown and then offered at a "fire sale" by a receiver will diminish greatly in value, as Mr. Kent credibly testified. Likewise, Mr. Kent noted that the potential sales by Ms. Damian involved a domain-name broker, not a website developer or owner.

## III.    Unjust Enrichment

A plaintiff seeking to establish an unjust enrichment claim must show that: "(1) the defendant has unjustly retained a benefit to the plaintiff's detriment, and (2) the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *MetroPCS*, 215 F. Supp. 3d at 634–35. In light of the foregoing analysis, Mr. Neer has not unjustly retained a benefit to TGC's detriment beyond the First Transaction Bucket. The transactions included in the First Transaction Bucket were nevertheless subject to contracts. As a result, Ms. Damian's unjust enrichment claim necessarily fails. *See Util. Audit, Inc.*, 383 F.3d at 688–89 (finding that "when two parties' relationship is governed by contract . . . they may not bring a claim of unjust enrichment unless the claim falls outside the contract."). Any relief therefrom would also be duplicative of the relief offered by her fraudulent conveyance claims.

## REMEDY

"Notwithstanding the voidability of a transfer or an obligation under [the IUFTA], a good-faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to . . . a reduction in the amount of the liability on the judgment." § 160/9(d)(3). Here, the following transfers are voidable: (1) $64,500 for TinyHouseSupplyShop.com; (2) $50,000 for BucksOf.com; (3) $30,000 for GrandeurSkincare.com; (4) $30,000 for PerfectPetBoutique.com; (5)

$22,500 for AmericanGreatness2020.com; (6) $20,000 for BattleRoyaleCommunity.com; and (7) $20,000 for ShopMyAmerica.com. The Court finds, in line with its previous discussion, that the above listed websites were worth at least $12,000 apiece. The Court consequently voids these transfers but holds Defendants jointly and severally liable for $153,000.

<b>CONCLUSION</b>

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) The Court rules in favor of Defendants on Count III.

(2) The Court rules in favor of Plaintiff on Counts I and II to the extent explained above.

(3) Plaintiff is entitled to $153,000 in damages.

(4) The Clerk is directed to enter judgment accordingly and close the case.

**DONE AND ORDERED** at Tampa, Florida, on September 7, 2023.

/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record